**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

KENNY WOODRUFF,
     Plaintiff,

vs.

OHIO DEPARTMENT
OF TRANSPORTATION,
     Defendant.

Case No. 1:18-cv-853
Cole, J.
Litkovitz, M.J.

**REPORT AND**
**RECOMMENDATION**

Plaintiff Kenny Woodruff brings this action against defendant Ohio Department of Transportation (ODOT) alleging claims of disability discrimination and failure to provide a reasonable accommodation under the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq.* (Rehabilitation Act). This matter is before the Court on ODOT's motion for summary judgment on all of plaintiff's claims (Doc. 61) and plaintiff's motion for partial summary judgment on his failure to provide a reasonable accommodation claim (Doc. 66). The parties have filed responses and replies thereto. (Docs. 69, 71-73). For the following reasons, the Court recommends that defendant's motion be granted in part and denied in part and that plaintiff's motion be denied.

**I.    Background**

The following facts are undisputed except where noted. Plaintiff was employed as a highway technician (HT) for ODOT. HTs perform highway maintenance and construction inspection duties, as well as services related to snow, ice, and flooding. All HTs are required to obtain and maintain a Commercial Driver's License (CDL), which is necessary to many of the position's functions, such as operating dump trucks and construction trailers. ODOT hired plaintiff in 2009 and ultimately promoted him to the level of HT3 in April 2017. At District 9, plaintiff reported to one of two Transportation Managers, who in turn reported to County

Manager/Transportation Administrator Craig Stout. The primary events giving rise to this action occurred after plaintiff's promotion and transfer to the District 9 garage.

    A. <u>Federal regulation related to HTs</u>

    The HT position is subject to U.S. Department of Transportation drug testing regulations (49 C.F.R. § 40.1 *et seq.*) and Federal Motor Carrier Safety Administration regulations (49 C.F.R. § 382 *et seq.*). (*See also* ODOT correspondence, Doc. 61-6 at PAGEID 1628). Commercial motor vehicle operators are subject to drug testing:

> In the interest of commercial motor vehicle safety, the Secretary of Transportation shall prescribe regulations that establish a program requiring motor carriers to conduct preemployment, reasonable suspicion, random, and post-accident testing of operators of commercial motor vehicles for the use of a controlled substance in violation of law or a United States Government regulation. . . .

49 U.S.C. § 31306(b)(1)(A). "Controlled substance" in this section is defined by reference to the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. § 802(6)), and 21 C.F.R. § 1308.12(b)(1) identifies Oxycodone and Oxymorphone as Schedule II controlled substances. Effective January 1, 2018, the U.S. Department of Transportation revised its rules to add opioids to the panel of drugs subject to testing. 49 C.F.R. § 40.85(d). Federal regulations also state:

> No driver shall report for duty or remain on duty requiring the performance of safety-sensitive functions when the driver uses any non-Schedule I drug or substance that is identified in the other Schedules in 21 CFR part 1308 except when the use is pursuant to the instructions of a licensed medical practitioner, as defined in § 382.107, who is familiar with the driver's medical history and has advised the driver that the substance will not adversely affect the driver's ability to safely operate a commercial motor vehicle.

49 C.F.R. § 382.213(b). "Safety-sensitive functions" are further defined to include "[a]ll time spent at the driving controls of a commercial motor vehicle in operation" as well as time related

to inspecting, servicing, condition, repairing, or obtaining assistance related to a commercial motor vehicle. *Id.* at § 382.107.

ODOT employee drug test results are forwarded from the testing lab to a Medical Review Officer (MRO), a physician certified to review drug test results. Upon the presentation of a valid prescription, the MRO will issue a negative test result (i.e., negative for illegal drug use); however, if use of the substance creates a safety concern, the MRO is to note the safety risk if the employee is unwilling to either discontinue or change his prescription. *See* 49 C.F.R. § 40.135(e).[1]

B. Plaintiff's drug testing and medical review

Plaintiff was involved in a motorcycle accident in August 2014. He suffered a shoulder injury, which is the disability alleged in this action. (*See* Doc. 1 at PAGEID 2). Plaintiff's pain management physician prescribed Percocet, a synthetic opioid, to manage his resulting shoulder pain. In September 2017, plaintiff tested positive for cocaine on a random drug test. The next month, plaintiff entered into a "Drug Free Workplace Last Chance Agreement," wherein he agreed to follow-up drug testing.

On April 5, 2018, plaintiff was subjected to a random drug test, which was positive for Oxycodone/Oxymorphone. Plaintiff presented Dr. Brian Heinen, his MRO, with a valid

---

[1] In the subsection titled "When must the MRO report medical information gathered in the verification process[,]" the regulation reads:

> You must also advise the employee that, before informing any third party about any medication the employee is using pursuant to a legally valid prescription consistent with the Controlled Substances Act, you will allow 5 business days from the date you report the verified negative result for the employee to have the prescribing physician contact you *to determine if the medication can be changed to one that does not make the employee medically unqualified or does not pose a significant safety risk.* If, in your reasonable medical judgment, a medical qualification issue or a significant safety risk remains after you communicate with the employee's prescribing physician or after 5 business days, whichever is shorter, you must follow § 40.327 [and report the medical information gathered].

*Id.* (emphasis added).

prescription for the opioid but would not agree to discontinue or change his prescription medication. Dr. Heinen therefore labeled plaintiff "negative" for illegal drug use but also a "safety risk." Upon learning this on April 11, 2018, County Manager Stout immediately picked up plaintiff from his work site and drove him back to the District 9 garage. ODOT provided plaintiff with a letter to give to his physician, which explained that ODOT was "require[d] . . . to ensure [plaintiff] is fit for duty and able to perform the safety sensitive duties of his position without risk of injury/accident to himself or others in the performance of these duties" given his prescription medication and dosage. (Doc. 44-1 at PAGEID 482). The letter further explained that plaintiff would not be permitted to perform any safety sensitive duties without a confirming "medical opinion that Mr. Woodruff would not be a threat to himself or others in the performance of these duties or the operation of this equipment as a result of the medication and dosage." (*Id.*).

With review of plaintiff's prescription underway, plaintiff asked ODOT Labor Relations Officer Janet Page to be brought back to work "do[ing] something that is not safety sensitive. . . ." (Doc. 61-6 at PAGEID 1627) (email from Ms. Page summarizing her May 10, 2018 conversation with plaintiff). Plaintiff also testified that he requested of County Manager Stout and Ms. Page that his work be limited to inspection, garage/shop duties, or computer work that would not raise safety concerns. (*See* Pl.'s Dep., Doc. 44 at PAGEID 207, 209, 276-77).

Plaintiff had been under the care of a pain management clinic, including certified nurse practitioner (CNP) Sarah Brown. CNP Brown provided a letter in response to ODOT's request. In pertinent part, it stated:

> [Plaintiff] denies any impairment in cognition with the medication and he has signed a contract with us agreeing not to drive or operate heavy machinery under the influence of his pain medication. [Plaintiff] is ok to return to work without restrictions as long as he continues to deny any impairment in cognition with his

4

> pain medication, and as long as his employer is aware of his current medications
> and in agreement for patient to continue his current job responsibilities on his
> current regime.

(Doc. 44-1 at PAGEID 486).

ODOT determined that this letter did not satisfy the requirement in 49 C.F.R. §

382.213(b) (confirmation from a licensed medical practitioner that plaintiff's medication would

"not adversely affect [plaintiff's] ability to safely operate a commercial motor vehicle") and

notified plaintiff accordingly.  Plaintiff did not obtain another note from his pain management

clinic or other licensed medical practitioner.

Having failed to alleviate ODOT's safety concerns, effective May 14, 2018, ODOT

placed plaintiff on administrative leave and directed him to submit to an independent medical

examination (IME) consistent with Ohio Admin. Code § 123:1-30-03.  (Doc. 44-1 at PAGEID

490).  In anticipation of the IME, ODOT sent the examining physician, Dr. Seth Vogelstein, a

letter outlining its specific objectives:

> 1. Is there credible, medical evidence to support [plaintiff's] inability to safely
> perform the duties of his position while continuing his current regimen of
> medication; and 2. Can you specifically state that the Percocet medication
> [plaintiff] is prescribed will not adversely affect his ability to safely operate a
> Commercial Motor Vehicle in accordance with CFR Part 382.213?

(Doc. 61-1 at PAGEID 1629).  On July 17, 2018, Dr. Vogelstein examined plaintiff.  In response

to these questions, he stated:

> It is my medical opinion that there is credible medical evidence to support
> [plaintiff's] inability to safely perform his work duties if he does in fact continue
> his current pain medication regimen.
>
> While [plaintiff] did sign a narcotic contract with his pain physician, there is
> never a guarantee that he will always take his medications as prescribed.  Any
> alterations in this regard, would result in significant mood alteration or
> impairment that would interfere with his ability to perform his work duties,
> especially those that are safety sensitive.  In my medical opinion, an alternative

5

> pain management regimen is necessary and indicated in this case, if [plaintiff]
> wishes to continue to perform his current work duties.
>
> . . .
>
> For the same reason as discussed above, I cannot state with any reasonable degree
> of medical probability, that [plaintiff] will not be adversely affected in regard to
> safely operating  motor vehicle, if he continues his current medication
> management, in the form of Percocet.  In this regard, I do agree with the MRO,
> who originally evaluated this case.  It is my medical opinion that it is appropriate
> for there to be safety concerns in this situation, if [plaintiff] continues his current
> pain regimen, including oxycodone/Percocet.

(Doc. 61-6 at PAGEID 1603).

Following the IME, ODOT initiated an involuntary disability separation (IDS), which included a pre-IDS hearing and contemplated plaintiff's rights to appeal the decision and request reinstatement.  *See* Ohio Admin. Code §§ 123:1-30-01(C), (E)-(F).  ODOT notified plaintiff in writing prior to the hearing that he was "required to provide medical documentation" to dispute ODOT's findings if he or his physician disagreed with its conclusion.  (Doc. 44-1 at PAGEID 492).  Plaintiff had his union representative at the pre-IDS hearing on August 21, 2018.  (Pl.'s Dep., Doc. 44 at PAGEID 253-54).  Plaintiff did not submit new medical documentation, though the hearing officer noted that plaintiff "indicated that he could speak to his physician about taking the medication at a different time."  (Doc. 61-6 at PAGEID 1616).[2]  ODOT finalized plaintiff's IDS effective August 31, 2018.  Plaintiff did not appeal the decision or apply for

---

[2] ODOT denies that plaintiff ever referenced the possibility of changing his medication timing but does not specifically challenge the accuracy of this hearing document (which is an exhibit to its motion); instead, ODOT cites the fact that neither Dr. Heinen nor Dr. Vogelstein noted any such request by plaintiff. (*See* Doc. 69 at PAGEID 2577 & n.11).  In fact, in the IME report, Dr. Vogelstein noted that "[plaintiff] had a discussion with his physician in regard to . . . a different schedule for taking his pain medication. . . . [Plaintiff] did speak with Dr. Danko and they are considering prescribing his medications so he only takes them after work and at night."  (Doc. 61-1 at PAGEID 1602-03).

reinstatement.[3] Plaintiff had two years from the date that he was no longer in active work status during which to request reinstatement. Ohio Admin. Code §§ 123:1-30-01(E), 123:1-30-04(A).

Plaintiff filed his complaint in this Court on December 4, 2018. (Doc. 1). He claims that he requested and was denied a reasonable accommodation. Specifically, he alleges that he "requested a reasonable accommodation in the form of not operating heavy machinery while under the influence of medication" and "several alternative accommodations . . . such as a transfer to an open position or removal of non-essential duties." (*Id.* at PAGEID 2-3). He also claims that he was terminated because of his disability. Plaintiff alleges that he underwent "significant shoulder surgery" and "was prescribed opiate medication" for "constant pain." (*Id.* at PAGEID 2).

ODOT has moved for summary judgment on all claims. Plaintiff's motion for summary judgment is limited to his failure to accommodate claim as related to his alleged request to be permitted "to carry out his usual job duties while remaining on [his prescribed opiate medication] (possibly only taking it at night)." (Doc. 66 at PAGEID 2537). Plaintiff subsequently abandoned any failure to accommodate claim related to a modification of his job duties. (*See* Doc. 71 at PAGEID 2584 n.1).

## II. Standard of Review

A motion for summary judgment should be granted if the evidence submitted to the court demonstrates that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[A] party seeking summary judgment . . . bears the initial responsibility of informing the district court of the basis

---

[3] Plaintiff did go through the grievance process in the spring and summer of 2018, but the grievance was denied prior to his IDS. (Doc. 44-1 at PAGEID 484-85).

for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. *See also Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 405 (6th Cir. 1992). The movant may do so by identifying that the non-moving party lacks evidence to support an essential element of its case. *See Barnhart v. Pickrel, Shaeffer & Ebeling Co., L.P.A.*, 12 F.3d 1382, 1389 (6th Cir. 1993).

Evidence in the record is viewed in the light most favorable to the nonmoving party, with all reasonable inferences drawn to that party's benefit. *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576-77 (6th Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)) (remaining citations omitted). Summary judgment is appropriate only where the evidence raises no genuine issues of material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The party opposing a properly supported motion for summary judgment "may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 & n.11 (1986) and Fed. R. Civ. P. 56(e)). In response to a properly supported summary judgment motion, the non-moving party "is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987) (citing *First Nat'l Bank of Ariz.*, 391 U.S. at 288-89).

The function of the reviewing court is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine factual issue for trial. *Anderson*, 477 U.S. at 249. The court is not required to search the entire record for material issues of fact, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), but the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. The party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *See Matsushita*, 475 U.S. at 586. The party opposing a motion for summary judgment "must make an affirmative showing with proper evidence" to defeat the motion. *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (citing *Street*, 886 F.2d at 1479). "Speculation does not create a genuine issue of fact. . . ." *Hedberg v. Ind. Bell Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995).

## III. Analysis

### A. Discrimination

The Rehabilitation Act prohibits discrimination solely on the basis of disability "under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency. . . ." 29 U.S.C. § 794(a). The statute defines "program or activity" as "a department . . . of a State or of a local government. . . ." *Id.* at § 794(b)(1)(A). "Apart from [§ 504 of the Rehabilitation Act's] limitation to denials of benefits 'solely' by reason of disability and its reach of only federally funded—as opposed to 'public'—entities, the reach and requirements of [the ADA and the Rehabilitation Act] are precisely the same." *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 452-53 (6th Cir. 2008) (quoting *Weixel v. Bd. of Educ. of N.Y.*, 287 F.3d 138, 146 n.6 (2d Cir. 2002)). *See also Bent-Crumbley v. Brennan*, 799 F. App'x 342, 345

9

(6th Cir. 2020) (under the Rehabilitation Act, a plaintiff must show that "the adverse action was taken *solely* by reason of the disability") (citing *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007)). Thus, claims brought under the Rehabilitation Act and ADA are generally reviewed under the same standards. *Shaikh v. Lincoln Mem. Univ.*, 608 F. App'x 349, 353 (6th Cir. 2015) (citing *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 201 (6th Cir. 2010)). Both statutes set forth "the same remedies, procedures, and rights." *Thompson v. Williamson Cnty., Tenn.*, 219 F.3d 555, 557 n.3 (6th Cir. 2000).

A plaintiff can establish a claim of disability discrimination through either direct or indirect evidence, and the paths are mutually exclusive. *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 453 (6th Cir. 2004) (citing *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348-49 (6th Cir. 1997)). The parties agree that plaintiff's disability discrimination claim is based on indirect evidence. (*See* Doc. 71 at PAGEID 2585).

The Court evaluates discrimination cases relying on indirect evidence by using the three-step framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Spence v. Donahoe*, 515 F. App'x 561, 567 (6th Cir. 2013) (citing *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001)). "First, a plaintiff must set forth a prima facie case of discrimination. . . . The burden then shifts to the employer 'to articulate some legitimate, nondiscriminatory reason' for its actions. . . . If the defendant carries this burden, the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were a pretext for discrimination." *Gribcheck*, 245 F.3d at 550 (quoting *McDonnell Douglas*, 411 U.S. at 802 and citing *Tex. Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Even with this burden-shifting framework, "[t]he ultimate burden of persuasion remains at all times with the plaintiff." *Id.* (citing *Burdine*, 450 U.S. at 253).

10

Under the indirect framework, a plaintiff must show that (1) he is disabled; (2) he is otherwise qualified for the position, with or without reasonable accommodation; (3) he suffered an adverse employment action; (4) the employer knew or had reason to know of plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. *Spence*, 515 F. App'x at 567 (citing *DiCarlo v. Potter*, 358 F.3d 408, 418 (6th Cir. 2004)). The fifth element of this prima facie case may also be established with evidence showing that "similarly situated non-protected employees were treated more favorably." *Id.* at 567-68 (quoting *Jones*, 488 F.3d at 404).

ODOT argues that the prima facie case in the context of the Rehabilitation Act consists of only three elements, relying on *Bent-Crumbley*, 799 F. App'x at 345 (citing *Jones*, 488 F.3d at 403) ("a plaintiff claiming disability discrimination under the Rehabilitation Act must show 1) that []he has a disability, 2) that []he is otherwise qualified to perform the job requirements with or without reasonable accommodation, and 3) that the adverse action was taken *solely* by reason of the disability."). This reading of *Bent-Crumbley*, however, conflates plaintiff's ultimate burden with his prima facie burden in a Rehabilitation Act disability discrimination case. The underlying district court decision, affirmed in *Bent-Crumbley*, distinguishes the two concepts. *See Bent-Crumbley v. Brennan*, No. 17-11767, 2019 WL 861116, at *6 (E.D. Mich. Feb. 22, 2019) (distinguishing the five-factor indirect framework "used to evaluate the plaintiff's showing" from the three-factor ultimate burden). Put differently by the Sixth Circuit:

> An inference that the adverse action occurred 'solely by reason of' the plaintiff's disability . . . is the result of the prima facie test, not an element of it. If the law were otherwise, the *McDonnell Douglas* framework would serve virtually no purpose in cases brought pursuant to the Rehabilitation Act and other single-motive statutes.

*Jones*, 488 F.3d at 406. The five-factor prima facie case is the appropriate analytical framework for plaintiff's disability discrimination claim.

### 1. *Disability*

Disability under the ADA is defined at 29 C.F.R. § 1630.2(g)(1)(i) as "[a] physical or mental impairment that substantially limits one or more of the major life activities of such individual[,]" and this definition is incorporated into the Rehabilitation Act at 29 C.F.R. § 1614.203(a)(2). "The threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis." *Id.* at § 1630.2(j)(1)(iii). The term "substantially limits" must be construed "broadly in favor of expansive coverage," and a "major life activity" is not necessarily an activity that is centrally important to daily life. *Id.* at §§ 1630.2(i)(1)(i) and (i)(2). For purposes of its motion for summary judgment only, ODOT does not contest this element of the prima facie case. (*See* Doc. 61 at PAGEID 1536).

### 2. *Otherwise qualified*

To be otherwise qualified for a position, a plaintiff must be able to perform the essential functions of that position with reasonable accommodation. 45 C.F.R. § 84.3(l)(1). Essential functions are those that are fundamental, not marginal. *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 762 (6th Cir. 2015) (citing 29 C.F.R. § 1630.2(n)(1)). In most cases, whether a plaintiff is otherwise qualified for a position requires the district court "to conduct an individualized inquiry and make appropriate findings of fact" in order to "protect[] [disabled] individuals from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns . . . as avoiding exposing others to significant health and safety risks." *Sch. Bd. of Nassau Cnty., Fla. v. Arline*, 480 U.S. 273, 287 (1987).[4]

---

[4] "A disabled individual . . . is not 'qualified' for a specific employment position if he . . . poses a 'direct threat' to the health or safety of others which cannot be eliminated by a reasonable accommodation." *Estate of Mauro By and*

ODOT argues that plaintiff is not otherwise qualified because he cannot perform the essential functions of his job—namely, maintaining a CDL consistent with federal regulations. Under those regulations, a "medical practitioner . . . familiar with the driver's medical history" had to confirm that plaintiff's medication regimen "[would] not adversely affect [his] ability to safely operate a commercial motor vehicle." 49 C.F.R. § 382.213(b). ODOT contends that while plaintiff presented a valid prescription for his medication, he failed to present evidence to satisfy this regulatory standard. In ODOT's view, CNP Brown's letter was "unconvincing" and "failed to indicate unequivocally that [plaintiff] was able to safely operate a commercial motor vehicle." (Doc. 61 at PAGEID 1538).

Plaintiff does not argue that maintaining a CDL and operating heavy machinery are not essential functions of the HT position; rather, he argues that he was otherwise qualified for the HT position because he performed these essential functions (including maintaining his CDL) for three years while taking his prescription medication without incident. He cites *Siewertsen v. Worthington Indus., Inc.*, 783 F. App'x 563, 573 (6th Cir. 2019), in which the Sixth Circuit concluded that a deaf plaintiff had raised a genuine issue of material fact as to whether he posed a direct threat by relying, in part, on the fact the plaintiff had operated a forklift for ten years without incident. Plaintiff further argues that ODOT's inquiry into his qualification for the HT position was not sufficiently individualized to pass muster under the Rehabilitation Act. He points to a recent (March 6, 2020) affidavit, in which Dr. Vogelstein concluded that plaintiff

---

Through *Mauro v. Borgess Med. Ctr.*, 137 F.3d 398, 402 (6th Cir. 1998) (citing 42 U.S.C. § 12111(3) and *Doe v. Univ. of Maryland Med. Sys. Corp.*, 50 F.3d 1261, 1265 (4th Cir. 1995)). Plaintiff suggests that ODOT may have waived any direct threat argument by failing to plead it as an affirmative defense. (*See* Doc. 66 at PAGEID 2548 n.4). ODOT responds that it does not raise a direct threat affirmative defense; rather, its employment decisions regarding plaintiff were the sole result of its attempt to comply with federal regulations and, in any event, it worked closely with plaintiff to obtain safety clearance from his health care provider. Therefore, the Court need not address whether defendant has demonstrated that plaintiff poses a direct threat for purposes of any affirmative defense.

would not pose a safety risk on his prescribed medication.  (Doc. 50-1 at PAGEID 1208-09).[5]

Plaintiff contrasts this affidavit with Dr. Vogelstein's original IME report, arguing that the latter

was discriminatory on its face because it relied on "speculation, stereotypes, and prejudice about

people who use Percocet" and not an individualized inquiry into plaintiff's condition and use of

the medication.  (Doc. 66 at PAGEID 2551).

     ODOT does not dispute that it was required to conduct "an individualized inquiry in

determining whether [plaintiff's] disability or other condition disqualifie[d] him from a particular

position[,]" including the consideration of plaintiff's "actual medical condition, and the impact,

if any, the condition might have on [plaintiff's] ability to perform the job in question."  *Holiday*

*v. City of Chattanooga*, 206 F.3d 637, 643 (6th Cir. 2000) (citing *Borgess*, 137 F.3d 398)

(remaining citation omitted).  ODOT argues that it persistently attempted to foster an

individualized inquiry into plaintiff's qualification while on his prescription medication (i.e.,

review by the MRO, ODOT's request for clearance from plaintiff's healthcare provider,

plaintiff's IME, plaintiff's pre-IDS hearing, and the two-year period during which plaintiff could

have sought reinstatement).  ODOT next argues that plaintiff's subjective belief that he

maintained his CDL and could perform his related HT duties does not trump the federal

regulatory dictates.  *See* 29 C.F.R. § 1630.15(e) ("It may be a defense to a charge of

discrimination . . . that a challenged action is required or necessitated by another Federal law or

regulation, or that another Federal law or regulation prohibits an action (including the provision

of a particular reasonable accommodation) that would otherwise be required. . . .").

---

[5] This affidavit postdates all of ODOT's administrative processes (concluding with his IDS, effective August 31, 2018) but is dated within the time during which plaintiff was eligible to apply for reinstatement (two years from his IDS).  *See* Ohio Admin. Code §§ 123:1-30-01(E); 123:1-30-04(A).

ODOT points to EEOC guidance to support its position.  *See McDonald v. Webasto Roof Sys., Inc.*, 570 F. App'x 474, 476 (6th Cir. 2014) (quoting *Kroll v. White Lake Ambulance Auth.*, 691 F.3d 809, 815 (6th Cir. 2012) ("Our precedent holds that EEOC guidance constitutes 'very persuasive authority in questions of statutory interpretation of the ADA.'") (internal quotation marks omitted).  ODOT quotes portions of three pieces of specific EEOC guidance to suggest that federal regulatory compliance insulated its actions regarding plaintiff.  The full text of the cited guidance is as follows:

**1. Could I be automatically disqualified for a job because I use opioids, or because I used opioids in the past?**

The ADA allows employers to fire you and take other employment actions against you based on illegal use of opioids, even if you do not have performance or safety problems.  Also, employers are allowed to disqualify you if another federal law requires them to do it.

But if you aren't disqualified by federal law and your opioid use is legal, an employer cannot automatically disqualify you because of opioid use without considering if there is a way for you to do the job safely and effectively. . . .

. . .

**4. What if my employer thinks that my opioid use, history of opioid use, or treatment for opioid addiction could interfere with safe and effective job performance?**

If you aren't using opioids illegally *and aren't disqualified for the job by federal law* the employer may have to give you a reasonable accommodation before firing you or rejecting your job application based on opioid use.  If the employer has let you know about its concern, then you need to ask for a reasonable accommodation if you want one. (See Question 9, below.)

A reasonable accommodation is some type of change in the way things are normally done at work, such as a different break or work schedule (e.g., scheduling work around treatment), a change in shift assignment, or a temporary transfer to another position.  These are just examples; employees may ask for, and employers may suggest, other modifications or changes.

However, an employer never has to lower production or performance standards, eliminate essential functions (fundamental duties) of a job, pay for work that is

not performed, or excuse illegal drug use on the job as a reasonable accommodation.

. . .

**12. What if I think I can do the job safely (*with a reasonable accommodation, if one is necessary*), but the employer disagrees?**

*Assuming you aren't disqualified by federal law* or using opioids illegally, the employer must have objective evidence that you can't do the job or pose a significant safety risk, even with a reasonable accommodation. To remove you from the job for safety reasons, the evidence must show that you pose a significant risk of substantial harm—you can't be removed because of remote or speculative risks. To make sure that it has enough objective evidence about what you can safely and effectively do, the employer might ask you to undergo a medical evaluation.

Use of Codeine, Oxycodone, and Other Opioids: Information for Employees, U.S. EQUAL

EMPLOYMENT OPPORTUNITY COMMISSION (issued August 5, 2020),

https://www.eeoc.gov/laws/guidance/use-codeine-oxycodone-and-other-opioids-information-

employees (last visited March 24, 2021) (footnotes omitted) (emphasis added consistent with

ODOT's brief; other emphasis removed).

ODOT emphasizes the italicized language in its motion but ignores and omits other

portions of this same guidance. For example, "an employer cannot automatically disqualify you

because of opioid use *without considering if there is a way for you to do the job safely and*

*effectively*" and "[t]o remove you from the job for safety reasons, the evidence must show that

you pose a significant risk of substantial harm—you can't be removed because of remote or

speculative risks." *Id.* (questions 1 and 12). These caveats are exactly those argued by plaintiff

and are encompassed in the federal regulation relied upon by plaintiff. *See* 49 C.F.R. §

382.213(b) (legal opioid use not permitted "*except when the use is pursuant to the instructions of*

*a licensed medical practitioner . . . who is familiar with the driver's medical history and has*

*advised the driver that the substance will not adversely affect the driver's ability to safely*

*operate a commercial motor vehicle*.") (emphasis added).  In the Court's view, 49 C.F.R. § 382.213(b) rests on the implicit assumption that legal opioid use *is not* disqualifying under federal law so long as essential functions can be performed safely notwithstanding use.

ODOT also relies on *Southall v. USF Holland, Inc.*, No. 3:15-cv-1266, 2018 WL 6413651 (M.D. Tenn. Dec. 5, 2018), *aff'd*, 794 F. App'x 479 (6th Cir. 2019), in which the court found that a plaintiff was not qualified for his truck-driving position based on his failure to comply with federal regulations regarding the operation of commercial motor vehicles.  This case is distinguishable, however, because the record therein reflected that the plaintiff both did not regularly maintain a Department of Transportation certification card and conclusively did not comply with treatment needed to ensure that he would drive safely.  *Id.* at *9.  It was based on this non-compliance with treatment that the medical professionals in *Southall* determined that the plaintiff was a safety risk; there is no such documented non-compliance with treatment in the record at bar.  *See id.* ("His own treating physician (and expert witness) testified that, because of his noncompliance with use of the CPAP machine, Plaintiff could not safely drive a big rig for [the employer].").

The Court concludes that plaintiff has presented evidence creating a genuine issue of material fact as to whether he is otherwise qualified for the HT position.  Dr. Vogelstein's March 2020 affidavit suggests that ODOT's conclusion as to plaintiff's risk may have been too remote or speculative as to demonstrate a substantial safety risk.  Plaintiff also presents testimony from several ODOT employees that they did not follow up with Dr. Vogelstein about his initial IME.  (*See* Johnson Dep., Doc. 49 at PAGEID 1050 (ODOT labor relations administrator testifying that he took no action following review of IME); Page Dep., Doc. 50 at PAGEID 1152 (District 9 labor relations officer testifying that she did not speak with or know of anyone that spoke with

Dr. Vogelstein about his IME); Dombrowski Dep., Doc. 51 at PAGEID 1263-64 (ODOT District 9 deputy director that approved proceeding with IDS testifying that he did not contact Dr. Vogelstein to clarify what plaintiff had identified as contradictory statements in the IME); Kelly Dep., Doc. 64 at PAGEID 1751 (ODOT payroll and benefits manager testifying that she never spoke with Dr. Vogelstein about his IME)).  Finally, while not dispositive, plaintiff's ability to perform the duties of an HT for three years without incident while taking Percocet could be relevant to a licensed medical practitioner's analysis under 49 C.F.R. § 382.213(b).  Plaintiff has established a genuine issue of material fact on this element.

### 3. *Adverse employment action and knowledge of plaintiff's disability*

ODOT does not specifically address the third element of the prima facie case but also does not appear to contest that plaintiff's IDS was an adverse employment action.  As to the fourth element of the prima facie case, ODOT argues that it did not consider plaintiff's disability at all with respect to his IDS.  Regardless, there is no doubt from the record that ODOT had knowledge of plaintiff's disability prior to his IDS.  Both CNP Brown's correspondence with ODOT (Doc. 61-6 at PAGEID 1605) and the IME report (*Id.* at PAGEID 1601) specifically reference plaintiff's chronic neck and left shoulder pain and corresponding Percocet prescription. The Court concludes that plaintiff has demonstrated a genuine issue of material fact on the third and fourth elements of the prima facie case.

### 4. *Replacement by a non-disabled person / plaintiff's position left open*

On this element, plaintiff argues both that plaintiff's position was left open for two years (consistent with Ohio Admin. Code § 123:1-30-01(E)) and that he was replaced by a non-disabled employee.  Having provided no evidence or substantive argument on the former

contention,[6] the Court focuses on the latter.  The latter contention is supported only by plaintiff's

affidavit, in which he states:

> Shortly after my [IDS], Aaron Carnihan, [an HT3], was transferred from
> Clermont County to the position I left open at Brown County.  To the best of my
> knowledge, information, and belief, Carnihan does not suffer from chronic
> shoulder and/or neck pain nor is he prescribed opioids for pain management.

(Doc. 70-1 at PAGEID 2583).

Plaintiff neither provides nor can the Court discern the basis for plaintiff's personal

knowledge of ODOT's subsequent hiring of Mr. Carnihan or Mr. Carnihan's personal medical

history.  *See Alexander v. Kellogg USA, Inc.*, 674 F. App'x 496, 499 (6th Cir. 2017) (citing Fed.

R. Civ. P. 56(c)(4) and holding the it is the submitting party's burden to show that "supporting

affidavits . . . [are] based on personal knowledge, meaning personal observations or

experiences.") (remaining citations omitted).  While courts may infer personal knowledge from

the contextual factors, no such context is provided by plaintiff in this case.  *See id.* (citing *Reddy*

*v. Good Samaritan Hosp. & Health Ctr.*, 137 F. Supp. 2d 948, 956 (S.D. Ohio 2000)).  Plaintiff's

affidavit excerpt above is the extent of plaintiff's argument regarding the final element of his

prima facie case, and the Court finds that it is insufficient to present a genuine issue of material

fact on the final element of plaintiff's prima facie case.  Because plaintiff has not presented a

prima facie case of disability discrimination, ODOT's motion for summary judgment should be

granted on this claim.

Even if the Court found that plaintiff met this final element of the prima facie case, he has

failed to present evidence showing a factual issue for trial on the remaining *McDonnell Douglas*

factors.  ODOT has offered a legitimate, nondiscriminatory reason for plaintiff's IDS: it had to

---

[6] *See Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("This court has consistently held that arguments not raised in a party's opening brief, as well as arguments adverted to in only a perfunctory manner, are waived.") (citation omitted).

comply with federal regulations.  However, plaintiff has not met his burden to show a genuine

issue of material fact that this reason is pretext for disability discrimination.

To rebut ODOT's proffered explanation for its adverse employment decision, plaintiff

must show by a preponderance of the evidence that: (1) the proffered reason had no basis in fact,

(2) the reason did not actually motivate the plaintiff's discharge, or (3) the reason was

insufficient to motivate discharge.  *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078,

1084 (6th Cir. 1994) (citation omitted), *overruled on other grounds by Gross v. FBL Fin. Servs.,*

*Inc.*, 557 U.S. 167 (2009).  "To carry [his] burden in opposing summary judgment, [plaintiff]

must produce sufficient evidence from which a jury could reasonably reject [ODOT's]

explanation of why it [proceeded with IDS]."  *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th

Cir. 2009) (race discrimination context) (citing *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d

516, 526 (6th Cir. 2008)).

The parties focus on the first prong: that the proffered reason had no basis in fact.[7]

Defendant maintains that the record reflects that its proffered reason was based in fact because

neither CNP Brown's letter nor Dr. Vogelstein's IME report conclusively meets the threshold

needed for compliance with 49 C.F.R. § 382.213(b).  In addition, ODOT relies on the "honest

belief" rule, which is that "as long as an employer has an honest belief in its proffered

nondiscriminatory reason for discharging an employee, the employee cannot establish that the

reason was pretextual simply because it is ultimately shown to be incorrect."  *Majewski v.*

*Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (citing *Smith v. Chrysler*

*Corp.*, 155 F.3d 799, 806 (6th Cir. 1998)).  This rule is applied where an employer's adverse

employment decision relied "on the particularized facts *that were before it at the time the*

---

[7] ODOT also makes an argument relative to the third prong (legitimate reason insufficient to motivate adverse
action), but plaintiff does address or acknowledge it in his response.

*decision was made.*"  *Id.* (citing *Smith*, 155 F.3d at 807) (emphasis added).  If an employer demonstrates an "honest belief" in its nondiscriminatory reason, "it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'"  *Chen*, 580 F.3d at 401 (quoting *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 713 (6th Cir. 2007)).

Plaintiff argues that ODOT's reason for proceeding with IDS was based on the wholesale adoption of Dr. Vogelstein's IME conclusion, which in turn "was based entirely on the discriminatory premise that [plaintiff] could, theoretically, abuse his medication and therefore pose a safety risk."  (Doc. 71 at PAGEID 2592).  As such, plaintiff argues that ODOT's decision to proceed with IDS was based on a negative stereotype of opioid users and not an honest belief in its proposed nondiscriminatory reason.  Plaintiff cites *Holiday*, 206 F.3d 637 (refusal to hire based on generalized preconceptions regarding HIV and not an individualized inquiry into the physical effects of his condition) and *Keith v. Cnty. of Oakland*, 703 F.3d 918 (6th Cir. 2013) (job offer revoked for a deaf plaintiff based on a cursory examination and not an individual inquiry of the applicant) to support his position that an employer's "honest belief" does not insulate a subpar individualized inquiry.

Neither *Holiday* nor *Keith*, however, addressed the "honest belief" rule.  In both cases, the records reflected utterly cursory (if not outright discriminatory) medical examinations leading to the adverse employment actions taken in those cases.  *See Holiday*, 206 F.3d at 644 (employer disqualified the plaintiff "because of his HIV status" notwithstanding a doctor's "complete failure to investigate the physical effects" of his condition); *Keith*, 703 F.3d at 923-24 (after a brief review of the plaintiff's file, the doctor "declared, '[h]e's deaf; he can't be a

lifeguard'" with no evaluation of the plaintiff's ability to perform a lifeguard's essential

functions).

Unlike *Holiday* and *Keith*, the record here reflects that ODOT honestly believed that

allowing plaintiff to remain in his HT position would violate federal regulations and that it

conducted an individualized inquiry.  ODOT provided plaintiff with a letter to give to his

physician, which instructed the physician to review plaintiff's position description and opine on

"his ability to safely perform these duties" and whether plaintiff would "be a threat to himself or

others in the performance of these duties . . . as a result of the medication and dosage."  (Doc.

61-6 at PAGEID 1604).  In response, plaintiff provided CNP Brown's letter, which equivocated

on the answers to these specific questions:

> [Plaintiff] denies any impairment in cognition with the medication. . . .  [Plaintiff]
> is ok to return to work without restrictions as long as he continues to deny any
> impairment in cognition . . . *and as long as his employer is aware of his current
> medications and in agreement for [plaintiff] to continue his current job
> responsibilities on his current regimen.*"

(*Id.* at PAGEID 1605) (emphasis added).  The MRO did not find that this letter alleviated the

safety risk.  (*Id.* at PAGEID 1654) (internal ODOT email summarizing telephone conversation

with MRO regarding CNP Brown's letter).  Plaintiff did not provide any additional opinions

from licensed medical providers.  (*See* Pl.'s Dep., Doc. 44 at PAGEID 261) ("Q. Did you ever

try and get another doctor's note after [CNP Brown's]?  A. I was going [to] but at that point they

got tired of being asked.  Q. Okay.  So you didn't ask again?  A. I didn't ask again.").

Although it was not required to, ODOT thereafter asked plaintiff to submit to an IME to

alleviate the federal regulatory concerns.  *See* Ohio Admin. Code § 123:1-30-03(A) ("An

appointing authority *may* require than an employee submit to medical . . . examinations for

purposes of [IDS]. . . .") (emphasis added).  Prior to this in-person examination, ODOT provided

Dr. Vogelstein an explanation of plaintiff's position's duties, a statement from plaintiff's pain

management practice, and detailed instructions regarding what it needed Dr. Vogelstein to

specifically evaluate in that context.  (Doc. 61-1 at PAGEID 1628-29).  Based on his

examination of plaintiff, Dr. Vogelstein concluded: (1) "It is my medical opinion that there is

credible medical evidence to support [plaintiff's] inability to safely perform his work duties if he

does in fact continue his current pain medication regimen[;]" (2) "[i]n my medical opinion, an

alternative pain management regimen is necessary and indicated *in this case*, if [plaintiff] wishes

to continue to perform his current work duties[;]" and (3) "[i]t is my medical opinion that it is

appropriate for there to be safety concerns *in this situation*, if [plaintiff] continues his current

pain regimen. . . ."  (*Id.* at PAGEID 1603) (emphasis added).

ODOT sent plaintiff a letter prior to his pre-IDS hearing, which stated: "If you or your

physician dispute the facts contained in the disability records, you will be required to provide

medical documentation that disputes the disability information.  This information would also

need to indicate your ability to return to work and perform the essential functions of your

position."  (Doc. 44-1 at PAGEID 492).  Plaintiff provided no such additional documentation.

(*Id.* at PAGEID 499) (ODOT memorandum regarding pre-IDS hearing) ("[Plaintiff] presented no

additional medical documentation showing he was fit for duty.").

ODOT finalized plaintiff's IDS effective August 31, 2018.  Over a year later, in March

2020, Dr. Vogelstein signed an affidavit disagreeing with certain of his conclusions from the

IME.  Plaintiff did not, however, choose to submit this evidence in connection with a request to

be reinstated under Ohio Admin. Code § 123:1-30-01(E).  Based on the evidence in the record,

the Court finds that *at the time* it decided to proceed with plaintiff's IDS, ODOT relied on its

honest belief that plaintiff's continued employment as an HT3 was a safety risk under federal

regulations. *See Majewski*, 274 F.3d at 1117 (citing *Smith*, 155 F.3d at 807). As such, the Court finds that plaintiff has not established that ODOT's proffered reason for plaintiff's IDS, even if mistaken, was not based in fact such that it was pretext for unlawful discrimination. Plaintiff has not presented sufficient evidence to create a genuine issue of material fact on whether ODOT's reason for plaintiff's IDS was pretext for unlawful discrimination, and ODOT's motion for summary judgment as to plaintiff's employment discrimination claim should therefore be granted.

      B.  Failure to accommodate

Plaintiff moves for summary judgment on his failure to accommodate claim as it relates to his alleged request to be permitted to "carry out his usual job duties while remaining on the prescription (possibly only taking it at night)." (Doc. 66 at PAGEID 2537). ODOT argues that, even if certain elements of this claim are conceded for purposes of argument, plaintiff cannot demonstrate that he was otherwise qualified for the HT3 position or that he in fact made this accommodation request. ODOT further argues that even if plaintiff requested an accommodation, he failed to engage in the interactive process, thereby precluding his reasonable accommodation claim. Defendant also moves for summary judgment on this claim.

In the ADA context, failure to accommodate claims are analyzed using the direct-evidence framework. *See Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007) ("[F]ailing to make a reasonable accommodation falls within the ADA's definition of 'discrimination.' Accordingly, claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination.") (internal footnote and citation omitted). But this understanding has not carried over to the Rehabilitation Act context. *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416-417 (6th

24

Cir. 2020) ("As Nissan points out, we have occasionally—though generally in unpublished cases—analyzed a failure-to-accommodate claim under the indirect test. . . .  These cases do not . . . distinguish *Kleiber* and its progeny. . . .  [The ADA and the Rehabilitation Act] are not identical.").  Here, the parties each analyze plaintiff's failure to accommodate under the indirect test.  (*See* Doc. 66 at PAGEID 2543; Doc. 69 at PAGEID 2572).  The Court will therefore do so as well.[8]

Under the indirect test, plaintiff must show that "(1) []he is disabled within the meaning of the Act; (2) []he is otherwise qualified for the position, with or without reasonable accommodation; (3) h[is] employer knew or had reason to know about h[is] disability; (4) []he requested an accommodation; and (5) the employer failed to provide the necessary accommodation."  *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982-83 (6th Cir. 2011) (citing *DiCarlo*, 358 F.3d at 418).  The burden thereafter "shifts to the employer to demonstrate that any particular accommodation would impose an undue hardship on the employer."  *Id.* at 983 (citing *DiCarlo*, 358 F.3d at 419).

The Court has determined that plaintiff has met elements one through three of the prima facie case in connection with plaintiff's discrimination claim.  As to element five, the parties agree that no accommodation was made.  The Court's analysis therefore focuses on element four: whether plaintiff requested an accommodation.

Plaintiff contends he requested an accommodation in the form of continuing to work as an HT3 while taking is prescription medication.  Plaintiff makes two arguments in this regard.  First, he contends that his grievance process and ODOT's decision to subject plaintiff to the

---

[8] Under either the direct- or indirect-evidence framework, "[p]laintiff bears the initial burden of establishing that an employer failed to accommodate a known disability."  *See Cheatham v. Brennan*, No. 1:18-cv-295, 2020 WL 5517245, at *2 (S.D. Ohio Sept. 14, 2020).

IME, in and of themselves, reflect ODOT's implicit understanding that plaintiff requested the accommodation of being permitted to carry out his job duties while remaining on his prescription medication.  (*See* Doc. 44-1 at PAGEID 484 (grievance documentation including, *inter alia*, plaintiff's request for reinstatement to his position); *id.* at PAGEID 490-91 (letters from ODOT to plaintiff regarding the scheduling of an IME to address his "fitness for duty").  Second, he argues he specifically articulated a request to be permitted to take his medication at a different time (as opposed to changing the type of medication) to eliminate ODOT's safety concerns.

Plaintiff's first argument rests at the crux of competing principles in Sixth Circuit reasonable accommodation law.  On one hand, "[t]he employee is not required to use magic words such as 'accommodation' and 'disability'; rather, we ask whether 'a factfinder could infer that [the interaction] constituted a request for an accommodation.'"  *Fisher*, 951 F.3d at 419 (quoting *Smith v. Henderson*, 376 F.3d 529, 535 (6th Cir. 2004)).  *See also White v. Honda of Am. Mfg., Inc.*, 191 F. Supp. 2d 933, 950 (S.D. Ohio 2002) ("The ADA does not require that any talismanic language be used in a request for reasonable accommodation.") (citations omitted).  In other words, an imprecise request may be sufficient, provided context makes clear "that it is being made in order to conform with existing medical restrictions."  *Leeds v. Potter*, 249 F. App'x 442, 449 (6th Cir. 2007) (citing *Henderson*, 376 F.3d at 535).

On the other hand, less than specific requests may not suffice depending on the particular circumstances.  *See, e.g., Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 306-07 (6th Cir. 2016) (plaintiff's conversation with a supervisor in which he used a recording device and referenced his "ADA deal" did not put his employer on notice of an accommodation request related to his alleged stress-related disability); *Deister v. Auto Club Ins. Ass'n*, 647 F. App'x 652, 658 (6th Cir. 2016) (a plaintiff's requests that an employer review his medical records, meet to

26

discuss employment conditions, and place him in a new position did not rise to the level of an accommodation request because they did not give the employer sufficient notice that they were related to his disability); *Coles v. Johnny Appleseed Broad. Co.*, 479 F. Supp. 3d 585, 601 (N.D. Ohio 2020) ("Plaintiff's passing reference to her desire to return to work is insufficient to put Defendants on notice of an accommodation request.").

*Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1044 (6th Cir. 1998), presents facts somewhat similar to those at bar.  In *Gantt*, the plaintiff was injured on the job.  *Id.*  Per long-standing and well-known company policy, employees were allowed one year of absence but would be terminated for absence beyond that time.  *Id.* at 1045.  The plaintiff informed her employer that she would be on a leave of absence "for six months to a year" and received temporary total disability benefits.  *Id.* at 1044-45.  When asked by her employer when she would be returning to work, the plaintiff responded that she would return as soon as she received a release from her doctor but did not know the exact time frame.  *Id.* at 1045.  The plaintiff never made a request for an extended leave or other accommodation and, per company policy, the employer terminated the plaintiff for failure to return to her employment within one year of her leave of absence.  *Id.* at 1145-46.  The plaintiff did not contact the employer to appeal her termination or to seek reemployment, even after obtaining a release from her physician to return to work shortly after her termination.  *Id.* at 1045.  The plaintiff argued that a formal accommodation request was unnecessary in this context; the employer knew about her injury, it was paying her temporary total disability benefits, and she had communicated to her employer that she intended to return as soon as possible.  *Id.* at 1046.  The Sixth Circuit disagreed and concluded that in the context of this case, the plaintiff did not meet her burden to make a reasonable accommodation request.  *Id.* at 1047.

Like in *Gantt*, the record here does not reflect that plaintiff ever explicitly requested to return to work on his prescription as prescribed (with no change to medication type or dosage) and he relies on his employer's implicit understanding of his request. *Unlike* in *Gantt*, however, ODOT's actions (pursuing the IME to further evaluate plaintiff's fitness for duty on his medication) reflect the understanding that plaintiff sought such an accommodation. There is likewise no question that ODOT understood plaintiff's grievance and the IME to be related to plaintiff's alleged disability, as contrasted with *Deister* and *Tennial*. The purpose of the request-for-accommodation requirement of the prima facie case is "to prevent a failure-to-accommodate claim from becoming a 'gotcha' for an unsuspecting employer." *Lowes v. Baldwin*, No. 2:18-cv-537, 2019 WL 7290504, at *14 (S.D. Ohio Dec. 30, 2019), *aff'd*, No. 20-3078, 2020 WL 7974381 (6th Cir. Oct. 15, 2020). This purpose is not undermined by the less than explicit request in this case. Therefore, the Court finds that plaintiff has raised a genuine issue of material fact as to whether he requested the accommodation of being permitted to continue working on his current medication regimen without any change to the medication type or dosage.

Plaintiff's second argument—that he specifically asked to be permitted to take his medication at a different time—has support in the record and is also sufficient to create a genuine issue of material fact. An ODOT memorandum concerning plaintiff's August 21, 2018 pre-IDS hearing documents plaintiff's request: "[Plaintiff] . . . indicated that he could speak to his physician about taking the medication at a different time." (Doc. 44-1 at PAGEID 499). The IME report itself also references this suggestion, with Dr. Vogelstein noting "[plaintiff] had a discussion with his physician in regard to . . . a different schedule for taking his pain medication. . . . [Plaintiff] did speak with Dr. Danko and they are considering prescribing his medications so he only takes them after work and at night." (*Id.* at PAGEID 480-81). The Court finds that

28

plaintiff has produced sufficient evidence of each element of his reasonable accommodation claim to withstand ODOT's motion for summary judgment.

Nevertheless, ODOT contends that even if plaintiff requested an accommodation, he failed to engage in the interactive process.  "Once an employee requests an accommodation, the employer has a duty to engage in an interactive process." *Fisher*, 951 F.3d at 421 (quoting *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 857 (6th Cir. 2018)).  Through this process, the parties are to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Kleiber*, 485 F.3d at 871 (quoting 29 C.F.R. § 1630.2(o)(3)).  Both the employer and employee "have a duty to participate in good faith." *Id.* at 871 (citing *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000) (en banc), *judgment vacated on other grounds*, 535 U.S. 391 (2002)).  If the Court determines that the interactive process was triggered, it "should attempt to isolate the cause of the breakdown and then assign responsibility." *Id.* (quoting *Bultemeyer v. Fort Wayne Cnty. Sch.*, 100 F.3d 1281, 1285 (7th Cir. 1996)).

Failing to engage in the interactive process is not an independent cause of action and arises only "if the plaintiff establishes a prima facie showing that he proposed a reasonable accommodation."[9] *Rorrer v. City of Stow*, 743 F.3d 1025, 1041 (6th Cir. 2014).  *See also Thompson v. Fresh Prods., LLC*, No. 20-3060, 2021 WL 139685, at *10 (6th Cir. Jan. 15, 2021) ("[Failure to engage in the interactive process] is a violation of the ADA only if plaintiff establishes a prima facie case of failure to accommodate.") (citation omitted).  "[W]hen the employer engages with an employee who refuses to participate in good faith or withholds

---

[9] Plaintiff's complaint does not raise this as an independent cause of action, but he argues that he adequately engaged in the interactive process in connection with his failure to accommodate claim.  (*See* Doc. 73 at PAGEID 2616-17).

essential information, the employer *cannot be liable* under the ADA for failure to accommodate." *Kovac v. Superior Dairy, Inc.*, 998 F. Supp. 2d 609, 619-20 (N.D. Ohio 2014) (citing *Wells v. Chrysler Grp., LLC*, No. 3:08-cv-2264, 2013 WL 2631371, at *6 (N.D. Ohio June 11, 2013); and *Kleiber v. Honda of Am. Mfg. Inc.*, 420 F. Supp. 2d 809, 828 (S.D. Ohio 2006), *aff'd*, 485 F.3d 862 (6th Cir. 2007)) (emphasis added). Where it is the employer's lack of engagement that breaks down the interactive process, such "failure is actionable . . . if it prevents identification of an appropriate accommodation for a qualified individual." *Ford Motor Co.*, 782 F.3d at 766 (quoting *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013)) (emphasis deleted) (remaining citation omitted).

The Court finds that the interactive process piece of the reasonable accommodation analysis prevents summary judgment for either party on plaintiff's failure to accommodate claim. There is a genuine issue of material fact as to which party bears responsibility for the breakdown in the interactive process as it relates to plaintiff's request to be accommodated by taking his medication at a different time. On one hand, plaintiff has shown that ODOT was aware that taking the medication at a different time could potentially alleviate ODOT's safety concerns. (*See* IME report, Doc. 44-1 at PAGEID 480-81) ("[Plaintiff] did speak with Dr. Danko and they are considering prescribing his medications so he only takes them after work and at night."). Plaintiff again raised this possibility at the pre-IDS hearing (*see* ODOT memorandum regarding August 21, 2018 hearing, Doc. 44-1 at PAGEID 499) ([Plaintiff] . . . indicated that he could speak to his physician about taking the medication at a different time." ), but there is no evidence in the record of follow-up related to this suggestion.

Construing these facts in plaintiff's favor for purposes of ODOT's motion for summary judgment, a jury could reasonably conclude that ODOT was responsible for the breakdown in the

interactive process when it did not entertain plaintiff's suggestion regarding the timing of his medication. *See Rorrer*, 743 F.3d at 1046 (employer's failure to discuss reassignment based solely on a municipal policy and without a good faith investigation of whether the employee could have *actually performed the duties* of the reassignment prevented summary judgment on plaintiff's failure to accommodate claim); *Talley v. Fam. Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1110 (6th Cir. 2008) (finding a genuine issue of material fact regarding the breakdown of the interactive process where the defendants did not follow through on an anticipated meeting with the plaintiff to discuss potential accommodations); *Gilhuly v. Consol. Rail Corp.*, No. 95-cv-75171, 1997 WL 816503, at *7 (E.D. Mich. May 20, 1997) (court unable to assign responsibility for failure to engage in the interactive process as a matter of law where the employer never discussed with the plaintiff whether it could accommodate her with additional training and the plaintiff never completed the originally authorized amount of training). If plaintiff believed that ODOT was not receptive to a change in the timing of his medication given the lack of follow-up related to this request, he would have no reason to pursue reinstatement on this basis.

On the other hand, plaintiff had several months during which he was encouraged by ODOT to provide a statement from his physician to substantiate the reasonableness of his accommodation request. ODOT scheduled the IME at its own expense to assist with that determination. Plaintiff then had an opportunity to present additional evidence at his pre-IDS hearing. Notwithstanding these opportunities, plaintiff did not substantiate his request for accommodation with formal documentation. (*See* Pl.'s Dep., Doc. 44 at PAGEID 261) ("Q. Did you ever try and get another doctor's note after [CNP Brown's]? A. I was going [to] but at that point they got tired of being asked. Q. Okay. So you didn't ask again? A. I didn't ask again.").

31

Finally, plaintiff had a two-year period to seek reinstatement, during which time he secured a second opinion from Dr. Vogelstein but did not present it to ODOT.  (*See* Vogelstein Aff., Doc. 50-1 at PAGEID 1208-09).

Construing these facts in ODOT's favor for purposes of plaintiff's motion for summary judgment, a jury could reasonably conclude that plaintiff failed to engage in the interactive process, thereby insulating ODOT from liability on the failure to accommodate claim.  *See Kleiber*, 420 F. Supp. 2d at 828 ("An employer cannot be found to have violated the ADA when responsibility for the breakdown in the informal interactive process is traceable to the employee and not the employer.").  *See also Karlik v. Colvin*, 15 F. Supp. 3d 700, 711-12 (E.D. Mich. 2014) (denying plaintiff's motion for summary judgment because, as related to the mandatory interactive process, the plaintiff refused to respond to any follow-up inquiries by the medical reviewer).  *Cf. Jakubowski*, 627 F.3d at 203 (summary judgment in favor of employer on failure to accommodate claim affirmed where employer met with the plaintiff, considered proposed accommodations, informed the plaintiff why they were not reasonable, offered alternatives, and *never hindered* interactive process).

In sum, the record largely reflects ODOT's efforts to participate in the interactive process in good faith.  As it pertains to plaintiff's particular request to be accommodated by taking his medication *at a different time*, however, ODOT's record of good faith is less clear.  Plaintiff has presented evidence that ODOT failed to further engage in the interactive process after he raised this more tailored accommodation request during both his IME and again at the pre-IDS hearing. As such, disposition of plaintiff's failure to accommodate claim is not appropriate as a matter of law.  Both parties' motions for summary judgment on this claim should be denied.

**IT IS THEREFORE RECOMMENDED THAT:**

1. Defendant's motion for summary judgment (Doc. 61) be **GRANTED** as to plaintiff's disability discrimination claim and **DENIED** as to plaintiff's failure to accommodate claim; and

2. Plaintiff's motion for partial summary judgment (Doc. 66) be **DENIED**.


Date:  4/9/2021

Karen L. Litkovitz
United States Magistrate Judge

33

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

KENNY WOODRUFF,                                    Case No. 1:18-cv-853
     Plaintiff**,**                              Cole, J.
                                                   Litkovitz, M.J.

     vs.

OHIO DEPARTMENT
OF TRANSPORTATION,
     Defendant.

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations.   This period may be extended further by the Court on

timely motion for an extension.  Such objections shall specify the portions of the Report objected

to and shall be accompanied by a memorandum of law in support of the objections.  If the Report

and Recommendation is based in whole or in part upon matters occurring on the record at an oral

hearing, the objecting party shall promptly arrange for the transcription of the record, or such

portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the

assigned District Judge otherwise directs.  A party may respond to another party's objections

**WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in

accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140

(1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).